2024 IL App (1st) 221043-U
No. 1-22-1043

FIRST DIVISION
June 10, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| ALASIN DEVENY, Individually and as Special Administrator of the Estate of Patrick Deveny, Deceased | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 2017 L 6321 |
| LINCOLN PARK FAMILY PHYSICIANS, JOHN TENHUNDFELD, M.D., and WENDY A. PLOEGSTRA, MSN, RN, FNP-BC, | ) ) ) ) | |
| | ) ) | Honorable Bridget Hughes, |
| Defendants-Appellees. | ) | Judge presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Following a directed verdict for the defendant physician and a jury verdict in favor of the remaining two defendants, we reverse and remand for a new trial of plaintiff's negligence claims against all three defendants. This is because (1) the trial court erred in entering a directed verdict as to the defendant physician and (2) the trial court erred in responding to an ambiguous jury question while it deliberated the claims against the remaining two defendants.

No. 1-22-1043

¶ 2    This is a medical negligence case brought by Alasin Deveny (Alasin or plaintiff), individually and as special administrator of the estate of her late husband, Patrick Deveny (Patrick). During a jury trial, the trial court granted a motion for directed verdict in favor of defendant John Tenhundfeld, M.D. (Dr. Tenhundfeld), after which the case proceeded against the remaining defendants, Lincoln Park Family Physicians and Wendy A. Ploegstra, MSN, RN, FNP-BC (Ploegstra). Following deliberations, the jury returned a defense verdict. Plaintiff's post-trial motion was denied.

¶ 3    On appeal, plaintiff asserts errors related to the directed verdict, the jury instructions, and the court's responses to a jury question during deliberations. For the following reasons, we find the court erred in entering a directed verdict for Dr. Tenhundfeld. Further, the court erred in responding to the jury's ambiguous question during its deliberations as to the remaining defendants. Thus, we reverse and remand for a new trial as to all three defendants, to be presided over by a different trial judge.

¶ 4    BACKGROUND

¶ 5    At the time of his death in 2011, Patrick was a patient of Dr. Tenhundfeld's medical practice, Lincoln Park Family Physicians. Ploegstra was a nurse practitioner at the same practice. After Patrick was diagnosed with carotid artery dissection in April 2011, Dr. Tenhundfeld prescribed Patrick anticoagulant medications.[1] Dr. Tenhundfeld last met with Patrick on April 25, 2011. Dr. Tenhundfeld asked Patrick to return for his next appointment three days later, April 28, 2011.

---

[1] "Carotid artery dissection occurs when there is a tear or separation in the layers of the carotid artery in your neck. *** The condition can heal itself over time but may cause life-threatening complications, such as stroke or bleeding in the brain." https://my.clevelandclinic.org/health/diseases/22697-carotid-artery-dissection (last visited April 26, 2024).

¶ 6    During the early morning hours of April 28, 2011, Patrick's wife, Alasin, made three calls to the medical practice and spoke witih Ploegstra about Patrick's symptoms. Patrick was eventually taken to a hospital and underwent surgery, but he died the following day. It is undisputed that the cause of death was an intra-abdominal bleed.

¶ 7    In June 2017, plaintiff commenced this lawsuit. Among other allegations, plaintiff alleged that defendants negligently managed his anticoagulant medications and that Alasin and Patrick were not instructed to seek emergency care during the calls made on April 28, 2011. The case proceeded to a jury trial in February 2022.

¶ 8    Dr. Morris Papernik

¶ 9    Plaintiff's medical expert, Dr. Morris Papernik, described a carotid artery dissection and testified that it is typically treated with anticoagulants, or "blood thinners," to prevent clot formation.[2] He testified that the major risk of anticoagulants is bleeding.

¶ 10    Dr. Papernik described an oral anticoagulant, warfarin, which is also known under the brand name Coumadin. He testified that a measurement known as "INR" (International Normalized Ratio) is used to check how well the blood clots.[3] He explained that a higher INR is appropriate for certain risky conditions. For a serious condition like carotid dissection, he testified that a 2 to 3 range is appropriate. He explained that a higher risk of clotting warrants more aggressive treatment with Coumadin, but this must be balanced with the risk of bleeding.

---

[2] "Anticoagulants are a family of medications that stop your blood from clotting too easily. They can break down existing clots or prevent clots from forming in the first place. These medications can help stop life-threatening conditions like strokes, heart attacks and pulmonary embolisms, all of which can happen because of blood clots." https://my.clevelandclinic.org/health/treatments/22288-anticoagulants (last visited May 3, 2024).

[3] "The INR is found using the result of the prothrombin time (PT) test. This measures the time it takes for your blood to clot. The INR is an international standard for the PT." https://www.urmc.rochester.edu/encyclopedia/content.aspx?contenttypeid=167&contentid=international_normalized_ratio (last visited April 26, 2024).

¶ 11    Dr. Papernik also described a separate anticoagulant, Lovenox, that is injected and works "from a different pathway." Dr. Papernik agreed that being on two anticoagulants increases the risk of not being able to stop a bleed. He testified that Lovenox takes effect within hours, whereas Coumadin takes longer. He testified that a physician typically does not put a patient on both drugs long-term; rather, "once the Coumadin is at the level you want it at, then you stop the Lovenox." The bleeding risk is highest in the "initial phase" when a patient is on both Lovenox and Coumadin.

¶ 12    Dr. Papernik testified that physicians should counsel patients on anticoagulants that they are at great risk of internal bleeding if they have trauma. He also testified that internal bleeds can occur even without trauma, so patients should be told that "if things change, * * * you need to let us know and you need to be seen" to make sure there is no bleeding.

¶ 13    Dr. Papernik had reviewed Patrick's medical records as well as the deposition testimony of Alasin, defendants, and other witnesses. Dr. Papernik was asked a number of questions by plaintiff's counsel about the contents of the medical records. Patrick had been a patient of Dr. Tenhundfeld for several years. At some point in late March or early April 2011, Patrick complained of headaches, neck pain, and nausea. Dr. Tenhundfeld initially treated Patrick for "sinus headaches" by treating him with antibiotics, nasal sprays, and steroids.

¶ 14    After Patrick's symptoms persisted, Dr. Tenhundfeld sent Patrick for an MRI, which revealed a dissection of the right carotid artery. Patrick was also sent for a spinal tap.[4] He

_____

[4] "A lumbar puncture (spinal tap) is a test used to diagnose certain health conditions. *** During a lumbar puncture, a needle is inserted into the space between two lumbar bones (vertebrae) to remove a sample of cerebrospinal fluid." https://www.mayoclinic.org/tests-procedures/lumbar-puncture/about/pac-20394631#:~:text=A%20lumbar%20puncture%20(spinal%20tap,a%20sample%20of%20cerebrospinal%20fluid.

developed a "spinal tap headache.[5]" He was hospitalized in mid-April to have a "blood patch to seal the leak" from the spinal tap.[6] While in the hospital, he was started on Lovenox and Coumadin. Patrick was discharged from the hospital on April 22.

¶ 15    Dr. Papernik opined that the likely cause of Patrick's carotid dissection was "fibrodysplasia of the blood vessel." He described this as a vascular abnormality in which the walls of the blood vessels are weak. A person with such a vascular abnormality has a higher risk for a dissection elsewhere in the body. Coumadin and Lovenox increase the risk that a person who suffers a dissection will not stop bleeding.

¶ 16    After his discharge from the hospital, Patrick followed up with Dr. Tenhundfeld at his office on April 25, 2011, to "check the level of his anticoagulation with the Coumadin." On that date, his INR was found to be 1.3. Dr. Papernik testified that this level is a bit higher than normal range, meaning Patrick was "starting to become anticoagulated with the Coumadin," although he was not at a "therapeutic" level. He agreed this meant Patrick was at an "increased risk to bleed."

¶ 17    Dr. Papernik testified that an INR reading actually reflects the level in the body three days earlier. Thus, the INR level measured on April 25 reflected the level in Patrick's system that existed on April 22. He agreed that a reasonable, careful physician would know that his "real level" as of April 25 was actually higher and could not be measured until three days later.

¶ 18    Dr. Papernik testified that Dr. Tenhundfeld's chart from April 25 indicated that Patrick "was doing okay" and "feeling pretty good", and that Patrick was planning to go to Texas the

---

[5] "A spinal headache is an intense headache that happens when the amount of cerebrospinal fluid (CSF) around your brain decreases" due to leakage of CSF, which can result from a spinal tap. https://my.clevelandclinic.org/health/diseases/17927-spinal-headaches

[6] A spinal headache may be treated with an epidural blood patch, in which "a provider injects a small amount of your blood over the hole that's leaking CSF. When the blood clots, it seals the hole." https://my.clevelandclinic.org/health/diseases/17927-spinal-headaches

following Friday, April 28. Dr. Tenhundfeld's note did not indicate that he counseled Patrick to monitor his INR status on the way to Texas. On April 25, Dr. Tenhundfeld increased Patrick's Coumadin dose to 6 milligrams. Dr. Papernik stated he did not criticize this dosing decision. However, he proceeded to opine that Dr. Tenhundfeld should have re-checked Patrick's INR sooner after the last appointment on April 25.

¶ 19    Asked about the standard of care for how soon to re-check INR level, Dr. Papernik testified that for a patient who is "at risk for either overanticoagulation or having an underlying vascular problem", the recommendation is to "check it in 48 hours" after the last reading. Thus, he believed Patrick's INR should have been rechecked on April 27, or 48 hours after the April 25 visit. Dr. Tenhundfeld's failure to do so was a deviation from the standard of care.

¶ 20    Plaintiff's counsel asked Dr. Papernik "What do you understand [Patrick's] symptoms to have been in the afternoon of 4/27?" Dr. Papernik testified that on the afternoon of April 27, Patrick had "GI discomfort" and gastrointestinal issues." That evening, Patrick left a "going away" dinner early because he was not feeling well. Dr. Papernik agreed the records reflected that Patrick had not eaten much after having a bratwurst in the afternoon.

¶ 21    Dr. Papernik testified that records showed that Alasin called Lincoln Park Family Physicians around 2:22 a.m. on April 28. She reached an answering service, and Ploegstra called Alasin back. Ploegstra's notes reflected that Alasin told Ploegstra that Patrick was having abdominal pain, had vomited, had chills, and was unable to have a bowel movement. Dr. Papernik opined that Patrick was having an intra-abdominal bleed that began on April 27 and became progressively worse. Because he was on anticoagulants, the bleed would not stop.

¶ 22    Dr. Papernik testified that Ploegstra's notes from the first call indicated that Patrick drank some Gatorade and his "color came back a little bit." The notes stated that it was "agreed that with

ongoing hydration, patient may continue to improve." Ploegstra's notes reflected the plan was to "push fluids" and follow up in the office the next morning at 10:00 a.m., but that Alasin should call if anything changed. Dr. Papernik agreed that Ploegstra's notes from the first call included a reference to the emergency room, but that "they agreed on a different plan" after Ploegstra was told that Gatorade made Patrick feel better. Ploegstra's notes did not state that Patrick refused to go to the emergency room.

¶ 23    Dr. Papernik further testified about Ploegstra's notes from Alasin's second call at 3:22 a.m., when she reported that Patrick was doing worse. He had vomited and he also had a small bowel movement with a tinge of blood in the toilet. He also had chills and sweats. Ploegstra's written notes from the second call stated:

> "Due to no further changes in his condition and suspected
> gastroenteritis from the barbecue and the bratwurst at lunch, when
> patient started feeling ill, patient and wife were advised to continue
> present management patient *** with sips of water and Gatorade for
> hydration. Rest, frequent monitoring of status changes. Wife was
> advised to call with any further change or call 911. If improvement
> in status, follow up in a.m. at the office."

¶ 24    Ploegstra's notes indicated that Alasin called a third time at 5:06 a.m., at which time she reported that Patrick was doing a "lot worse" and had "vomiting, dark color, and often." The notes reflected that Ploegstra advised Alasin to "immediately call 911." Dr. Papernik agreed this was the first time it was charted that they should call 911.

¶ 25 Patrick was transported by ambulance to the emergency room. An INR draw in the emergency room showed that his INR was 2.0. In the emergency room, Patrick suffered cardiac arrest, from which he never woke up.

¶ 26 Patrick was taken to surgery, where it was discovered that he had internal bleeding of the interior mesenteric artery. Dr. Papernik testified that surgeons were able to stop the bleeding. However, Patrick died because too much time had passed and "he was hypoxic for too long." Dr. Dr. Papernik testified the "bleed was totally fixable."

¶ 27 Dr. Papernik gave his opinion that Dr. Tenhundfeld's instructions "were below the standard of care." Specifically, he opined that Dr. Tenhundfeld should have asked Patrick to come back on April 27 to have INR rechecked (that is, 48 hours after the April 25 appointment), instead of April 28. Thus "the criticism would be that he should have come in at least a day sooner to know where the INR was going."

¶ 28 Dr. Papernik also criticized Dr. Tenhundfeld's approval of Patrick's travel plans, stating: "the standard of care would be that the patient should be stabilized on the medication before he was allowed to travel in a car, while on both these medications, and not -- and you don't know where his INR is going. So that's a deviation as well." He agreed that Dr. Tenhundfeld's notes gave the impression that "traveling was fine" and that Patrick's condition was "not going to affect [Patrick's] ability to move."

¶ 29 When plaintiff's counsel asked Dr. Papernik if he believed Dr. Tenhundfeld's deviations from the standard of care caused Patrick harm, he answered: "Well, they contributed to his demise." He subsequently testified that Dr. Tenhundfeld's instructions contributed to Patrick's death because "there was not enough emphasis placed on the fact that things can go bad really

fast." He agreed that "had [Patrick's] INR been checked on the 27th, that would have been before the emergency room visit" on the morning of April 28.

¶ 30 Dr. Papernik also gave his opinion that Ploegstra caused or contributed to Patrick's death, because "the delay of getting him to the hospital allowed the bleed to persist and continue." He testified that if Patrick had gotten to the emergency room sooner, he would have survived.

¶ 31 On cross-examination, Dr. Papernik acknowledged that Dr. Tenhundfeld documented that he counseled Patrick, although the records did not state how much time he spent counseling Patrick or the details of what he told Patrick or Alasin. Dr. Papernik acknowledged he did not know what Dr. Tenhundfeld told them about the risk of bleeding. However, Dr. Papernik testified that Patrick and Alasin's actions showed that they were not concerned.

¶ 32 Dr. Papernik agreed with defense counsel that as of April 27, 2011 (48 hours after the April 25 visit to Dr. Tenhundfeld), the INR level would not be supratherapeutic. That is, he agreed that if the INR had been checked in 48 hours, it would not have shown Patrick was "overanticoagulated." He also agreed that Patrick's INR was at a "therapeutic" level, 2.0, when it was checked on April 28 in the emergency room.

¶ 33 Defense counsel asked Dr. Papernik to explain the basis for his criticism that Dr. Tenhundfeld did not adequately communicate to Patrick and Alasin that "things could go bad fast." Dr. Papernik responded that he could tell "from their actions, they were getting ready to move, they were packing, the movers were coming on the 28th." He testified that "they were in the moving mode, and so they were apparently oblivious about what would possibly happen." Dr. Papernik acknowledged he did not know what was said by Dr. Tenhundfeld to Patrick and Alasin, but maintained that "[t]heir actions in getting ready to move" showed "that they weren't concerned."

¶ 34    When defense counsel asked Dr. Papernik to state any other way in which Dr. Tenhundfeld's negligence caused Patrick's injury, he answered: "The failure to recognize the possibility that *** this may actually be a vascular abnormality and the patient needs to be monitored more closely." When defense counsel asked if it would be "speculation" to say whether Patrick's treatment would have changed had he been monitored more closely, Dr. Papernik answered: "Well, yeah, somewhat. But you don't know what would have happened if you checked it on the 27th."

¶ 35    Dr. Papernik acknowledged that Ploegstra testified at her deposition that in the April 28 phone calls she advised Patrick and Alasin to go to the emergency room, but Patrick did not want to go. He also acknowledged Alasin's conflicting deposition testimony that Ploegstra never mentioned going to the emergency room during those calls.

¶ 36    On redirect examination, Dr. Papernik agreed that the medical records did not reflect that Dr. Tenhundfeld counseled Patrick about the risk of bleeding. He agreed that although the emergency room INR measurement was 2.0, the real number was higher because the number "reflects the dose from three days before." Thus, he agreed that Patrick was "likely supratherapeutic" when he got to the emergency room.

¶ 37    Dr. Papernik acknowledged that some literature indicates that patients on Coumadin should have INR checked every 72 hours. However, he opined that this is not the case for patients with a vascular abnormality, or for patients who are also on Lovenox. He maintained that Patrick's INR should have been checked 48 hours after the April 25 visit, that is, April 27, 2011.

¶ 38    Elsewhere on redirect examination, plaintiff's counsel elicited the following testimony from Dr. Papernik about what would have happened had Patrick been seen on April 27:

"Q. Do you believe Pat was bleeding on 4/27?

A. Yes.

Q. And do you believe, if he saw Dr. Tenhundfeld on 4/27, Dr. Tenhundfeld would have realized he had signs and symptoms of bleeding, or should have realized?

A. Yes."

¶ 39     Also on redirect, Dr. Papernik again testified that Patrick and Alasin's actions indicated that Patrick was not adequately counseled: "they were proceeding as if everything was going to go ahead [with the move], * * * they didn't anticipate any problems. And the fact that the movers were coming on Thursday, and so therefore they felt that everything was under control and they can leave on Friday."

¶ 40     On recross-examination, he agreed that Dr. Tenhundfeld used a dosing protocol adopted by the American Academy of Family Practice. He agreed that when the INR was tested on April 28, it was not supratherapeutic because it was not over 2.0.

¶ 41     Carol Patton, NP

¶ 42     Plaintiff called Carol Patton, a nurse practitioner, as an expert witness. She had reviewed medical records and deposition testimony, including that of Alasin and Ploegstra.

¶ 43     Patton was asked about the standard of care as to how a nurse practitioner should handle an after-hours call. She testified that a nurse practitioner must "assume the worst" and make a decision quickly. She testified that unless one is confident there is not a life-threatening situation, a nurse practitioner should direct the patient to the emergency department.

¶ 44     Patton testified that Ploegstra deviated from the standard of care because she should have "sent the patient to the ER or called 911 for the patient." She opined that in the first two calls in

the early morning of April 28, 2011, Ploegstra breached the standard of care by giving advice other than telling Patrick to go to the emergency room.

¶ 45    Alasin Deveny

¶ 46    Alasin testified that she and Patrick were married in 2002. As of spring 2011, they were planning a move from Chicago to Texas for Patrick to pursue a job opportunity.

¶ 47    Dr. Tenhundfeld had been Patrick's primary care physician since 2005. Alasin testified that Patrick was active, had no significant medical history, and was generally healthy. He was 40 years old at the time of his death.

¶ 48    In March 2011, Patrick told Alasin he had a "sinus infection" and complained of headaches, sinus pressure, and runny nose. He was given a prescription nose spray and antibiotics. She recalled he went to the doctor multiple times, including a visit to Dr. Tenhundfeld on March 29.

¶ 49    In early April 2011, Patrick still felt congested and stuffy and complained of headaches from "sinus pressure." After another visit with Dr. Tenhundfeld, an MRI was ordered.

¶ 50    Alasin testified that, one April morning when Patrick wasn't feeling well, she told him to call the doctor's office. After he called, Ploegstra told him to go to the hospital. Patrick underwent a "lumbar thing" at the hospital but returned home.

¶ 51    On the evening of April 18, Alasin returned from work to find Patrick hunched over and complaining of very bad headaches. She brought him to the emergency room. Patrick stayed in the hospital until Friday, April 22. During the hospitalization, she was told that there was a tear of a "carotid artery in his neck." She recalled Dr. Tenhundfeld telling her that Patrick would be put on "pills and a shot" to prevent blood clots, and that his INR would be checked on April 25.

¶ 52    Alasin went with Patrick to Dr. Tenhundfeld's office on April 25, 2011, where he administered a blood test. She recalled telling Dr. Tenhundfeld that they were moving to Texas and that she asked if they needed to delay the trip. Dr. Tenhundfeld said that they could travel. She specifically recalled he told them they could find a doctor in Texas to do the blood check: "[W]e said, Is it okay to move? He said yes, and that when we got to Texas, to just find someone. I said, What do we look for? He said, Anybody can do it. Let them know you need an INR." Dr. Tenhundfeld told them to come back on April 28 for another INR blood check, and they made an appointment to see him on that date.

¶ 53    On April 27, Alasin was home packing while Patrick went to a barbeque at a friend's home, which was to be followed by a Cubs game with a number of friends. At some point after Patrick went to the ballpark, he called Alasin and asked her to pick him up because he was tired. She brought him home. While she packed, he rested and was "organizing and logging his comic books."

¶ 54    That evening, they had plans to join neighbors in their apartment building for a goodbye dinner party. She recalled that Patrick took maybe "one bite of food" before he said he had a stomachache and excused himself to go back to their apartment. When Alasin asked if he was ok, he said "Yeah. I am just going to – he wanted to go to the bathroom."

¶ 55    Alasin returned to their apartment about 45 minutes to an hour later. Patrick answered the door and stated he had a stomachache and was trying to pass gas. Shortly thereafter, he was "sitting in the bathroom a lot trying to go to the bathroom" and asked her to get something for his constipation. She went to a CVS and brought home some Gas-X. He took one and said he felt a bit better but was still very tired and had a stomachache. He kept going to the bathroom, trying to have a bowel movement.

¶ 56     Patrick's symptoms worsened sometime after midnight. He started to get sweaty, his "stomach hurt pretty bad, and he was thirsty." He had been drinking Gatorade and water but threw up clear vomit. His skin became gray.

¶ 57     Alasin called Dr. Tenhundfeld's office around 2:32 a.m. and reached an answering service. Ploegstra called Alasin back soon afterward. Alasin kept her phone on speaker mode during the call. Most of the discussion was between Ploegstra and Alasin, but Alasin brought the phone over to Patrick so Ploegstra could ask him directly about what he had eaten and how his stomach felt. Patrick told Ploegstra that he ate bratwurst at the barbecue. Alasin recalled Ploegstra said "I wonder if that's giving you the stomachache" and mentioned that it could be a bowel obstruction.

¶ 58     During the first phone call, Ploegstra told them that Patrick should keep drinking water. She told Alasin to call back if he worsened. Alasin testified that at no point did Ploegstra use the word "bleed," indicate there was a potentially life-threatening condition, or mention calling 911 or going to the emergency room.

¶ 59     After the first phone call, Patrick was "sleeping on and off" and trying to use the bathroom. At one point he said he had a very small bowel movement and momentarily felt better, but it was "short lived." He asked for a pillow and blanket in the bathroom. Alasin recalled Patrick was "laying down a lot", getting very sweaty, and "his color was kind of off." He drank water but was throwing it up.

¶ 60     Alasin made a second call around 3:23 a.m., and Ploegstra called her back. She told Ploegstra that Patrick was sweaty, his skin was gray and he was throwing up a lot more. Ploegstra told Alasin she could bring Patrick to the office "first thing in the morning", at 8:00 or 8:30, even if his scheduled appointment was not until later. Ploegstra told Alasin to continue to have Patrick rest and drink water and again said to call back if anything changed. Alasin testified that Ploegstra

did not speak to Patrick during the second call. During the second call, Ploegstra did not indicate there was a life-threatening situation and did not discuss calling 911 or going to the emergency room.

¶ 61    After the second call, Patrick got more sweaty and gray. He began throwing up and something that looked like "coffee grinds" was in the vomit. Alasin texted a friend and told her what was going on; her friend told her to call 911. Alasin called 911 and was told an ambulance was being sent.

¶ 62    After Alasin called 911, she again called the answering service, and Ploegstra quickly returned the call. Alasin told Ploegstra what happened and that she had called 911. Ploegstra told her "[y]ou did everything right" and indicated that she would let Dr. Tenhundfeld know.

¶ 63    Paramedics arrived and loaded Patrick into an ambulance. Alasin drove to the hospital while he was taken to the emergency room. A doctor eventually told her that Patrick had gone into cardiac arrest.

¶ 64    Patrick was later taken to the ICU. He underwent surgery that evening. Shortly after surgery, Alasin was told that he was not going to survive. He died the next day, April 29, 2011. Dr. Tenhundfeld later told Alasin the cause of death was a "bleed in the S part of the colon."

¶ 65    Following Alasin's testimony, her counsel presented excerpts from the videotaped deposition testimony of Dr. Tenhundfeld and Ploegstra. In his deposition testimony, Dr. Tenhundfeld indicated that Coumadin and Lovenox "worsened" Patrick's bleed that began on April 27. He acknowledged that a combination of anticoagulants would "make the bleeding very difficult for the body to stop on its own." He agreed when asked if was more likely than not that Patrick would have survived if he had received treatment earlier.

¶ 66    Plaintiff's counsel also played portions of Ploegstra's videotaped testimony. In those excerpts, she acknowledged that she knew that Patrick was on anticoagulants and was at a "high level of risk for a bleed."

¶ 67    Directed Verdict as to Dr. Tenhundfeld

¶ 68    After plaintiff rested, defendants moved for a directed verdict as to Dr. Tenhundfeld, citing lack of proof of causation between his alleged negligence and Patrick's injury. During argument on the motion, the court asked plaintiff's counsel to specify "exactly what [are] the deviations from the standard of care of Dr. Tenhundfeld" that had been proven. Plaintiff's counsel argued there was "deviation on the management of the Coumadin" and the "timing of the recheck of the INR, the 48 hours versus 72." Plaintiff argued it was "incumbent to check within 48 hours, rather than release him to go to Texas sooner."

¶ 69    When the court asked how Dr. Tenhundfeld's advice caused Patrick's death, plaintiff's counsel explained that Patrick should have been instructed to return in 48 hours after the April 25 appointment (that is, April 27), so that he "would have been in the office" on that day, when he was showing symptoms of an abdominal bleed. Plaintiff's counsel argued there was testimony that the bleed started on April 27 and that Patrick was complaining of symptoms "in the afternoon" on that date.

¶ 70    Plaintiff's counsel thus argued that, had Dr. Tenhundfeld scheduled a follow up appointment for an INR check on April 27 instead of April 28, Patrick's internal bleeding would have been discovered and treated in time:

"THE COURT: What should [Dr. Tenhundfeld] have done?

[Plaintiff's counsel]: So he had to see him in the office on the 27th, he had to take his INR, and not just take his INR, do the physical exam, which Pat would have seen--

THE COURT: Dr. Papernik never said this.

[Plaintiff's counsel:] – and all the symptoms that Pat is reporting to Allie from the baseball game, all the symptoms he's telling her in that afternoon, when everyone's saying more likely than not he's bleeding, everyone in the case agrees on that, he's bleeding in the afternoon of 4/27.

More likely than not he's bleeding. He has symptoms associated with the bleed. He has a vascular abnormality, no explanation for a carotid dissection. The doctor has to consider he's at high risk for another bleed elsewhere due to the vascular abnormality, and examine him for any such bleeds or signs and symptoms.

He doesn't have to say it definitely would have happened, Judge. He has to say, more likely than not, to a reasonable degree of medical certainty, which is what he said, that he would have been showing signs and symptoms of a bleed * * * Dr. Tenhundfeld had, under the standard of care, a duty to consider him a risk, a high risk for other bleeds in other areas, which is what he had because of his vascular abnormality, and treat him accordingly that day. Then you

> have to send him to the hospital to have the Coumadin reversed and
>
> all the things he said."

¶ 71    In response, defense counsel argued it was too speculative to assume that, had Patrick visited Dr. Tenhundfeld's office for an INR check on April 27, he would have exhibited symptoms of internal bleeding that would lead to timely treatment. Noting evidence that Patrick began complaining of symptoms in the afternoon, defense counsel argued that Patrick may have shown "no symptoms" if he saw Dr. Tenhundfeld for a morning appointment on April 27. Defense counsel also argued that it was speculative to suggest that Patrick would have acted differently, "had there been another opportunity on the 27th to remind the patient of how bad things can go."

¶ 72    The court agreed that plaintiff failed to prove proximate causation to sustain negligence against Dr. Tenhundfeld. The court commented that even if Patrick returned to the doctor's office in 48 hours, another INR reading "wouldn't be indicative of an abdominal bleed." Rather, "[t]he only thing that would have indicated an abdominal bleed were his physical symptoms." It noted there was "no testimony" that checking his INR on April 27 would have revealed an abdominal bleed. The court also remarked there was "no evidence that Dr. Tenhundfeld did not inform him of all of the risks associated with this drug." The court thus granted the motion for directed verdict as to Dr. Tenhundfeld.

### ¶ 73    Dr. Tenhundfeld

¶ 74    After the directed verdict for Dr. Tenhundfeld, the defense presented its case on behalf of the remaining defendants, Ploegstra and Lincoln Park Family Physicians.

¶ 75    The defense called Dr. Tenhundfeld to testify. He described anticoagulation therapy and explained that after a carotid artery dissection, blood clots can form that could cause a stroke. This was the risk he was trying to prevent by prescribing Lovenox and Coumadin to Patrick.

¶ 76    Dr. Tenhundfeld testified that on April 25, Patrick's INR was 1.3, which was "subtherapeutic"; the therapeutic range was between 2 and 3. Patrick's INR was 2.0 when it was measured after he was brought to the emergency room on April 28.

¶ 77    Dr. Tenhundfeld testified that prior to Patrick's discharge from the hospital on April 22, 2011, he discussed Coumadin with Patrick while Alasin was in the room. He stated that he customarily tells patients about the increased risk of bleeding with anticoagulants, and that it can be fatal. He tells patients to watch out for headache, chest pain, or abdominal pain, as they can indicate internal bleeding. He testified that a note in the medical records reflected that he counseled Patrick and Alasin about the risk of bleeding.

¶ 78    Dr. Tenhundfeld further testified that on April 25, he measured Patrick's INR, which was 1.3. This was below the "treatment goal" of a level between 2 to 3, according to the protocol of the American College of Family Practitioners. Thus, he directed Patrick to increase his daily dosage from 5 milligrams to 6 milligrams.  He instructed Patrick to return in three days (April 28), at which time "we were going to repeat his INR."

¶ 79    Wendy Ploegstra

¶ 80    Ploegstra testified that during the calls on the early morning of April 28, 2011, she made shorthand "scratch notes" while she spoke on the phone. Later on the morning of the 28th, she reviewed the shorthand notes to write out more complete notes. She also typed the "exact information word for word" from her handwritten notes into the medical records.

¶ 81    As of April 28, 2011, Ploegstra was aware that Patrick was on Lovenox and Coumadin. She knew that these medicines make it more difficult to stop bleeding. Ploegstra testified about her notes from the first call at 2:25 a.m., which reflected she spoke to both Patrick and Alasin. Her

notes said: "Patient said he had vomited bile, not blood, and felt weak. On his way to bathroom, he ran into walls and fell down. Wife reported a gurgling sound and was concerned."

¶ 82   Ploegstra's notes further said that "Patient and wife were both advised to go to emergency room for possible bowel obstruction and stroke." Ploegstra recorded that Patrick "told [her] he did not feel it was an emergency."

¶ 83   Ploegstra testified that she recommended going to the emergency room during the first call, but Patrick indicated "it's not that bad. I don't think this is an emergency." Ploegstra recalled she told them that "there could be bleeding," although that was not specifically documented in her notes.

¶ 84   Ploegstra acknowledged the notes from the first call said: "It was then agreed that with ongoing hydration, patient may continue to improve." However, she maintained that she primarily recommended going to the emergency room. She stated: "The agreed upon part was the advice that if you're going to stay home then * * * this is some medical advice I could provide you at home. But not an alternative to going to the emergency room." She denied that she advised them that it was sufficient to remain home and continue to hydrate. Ploegstra testified that the majority of the first phone call was a "back and forth" discussion trying to convince Patrick to go to the emergency room.

¶ 85   Ploegstra also testified about her notes of the second call at 3:22 a.m. They reflected that Alasin reported that Patrick was worse and "vomited up the water/Gatorade with some yellow color to it, not blood, since last phone call." The notes further stated that: "Patient denied no blood in vomit, not blood in actual stool, no increasing abdominal pain, no headache."

¶ 86   Ploegstra testified that in the second call, she again advised Patrick to go to the emergency room. However, he indicated that he felt his symptoms were from stomach upset "related to the

prior day's barbecue that he ate." Ploegstra maintained her primary recommendation was to go the emergency room, but if Patrick and Alasin would not do so, her secondary advice was reflected in the portion of that note that said to "continue present management with sips of water/Gatorade for hydration, rest, and frequent monitoring of status changes." She agreed she did everything she could do to convince Patrick to go to the emergency room.

¶ 87    Ploegstra's notes from the third call at 5:06 a.m. stated: "Wife called to report patient doing a lot worse. Now vomiting dark color and often. Advised wife immediately to call 911. Wife asked what to tell 911, and I advised her to say her husband is very sick and needs an ambulance." Ploegstra agreed that at that point it was an "emergency" and Patrick needed immediate attention.

¶ 88    Janet Davis, NP

¶ 89    The defense also called nurse practitioner Janet Davis as an expert witness. Davis testified it was not unusual for a nurse practitioner to take handwritten notes and transcribe them later, without keeping the original notes. Davis testified that, based on Ploegstra's notes and depositions, she believed Ploegstra had in fact advised Patrick to go to the emergency room. She agreed that Ploegstra would have violated the standard of care if she had not recommended going to the emergency room. However, she did not believe the standard of care required Ploegstra to call 911 or to call an ambulance for Patrick. Based on her review, Davis believed Ploegstra had met the applicable standard of care for a nurse practitioner.

¶ 90    Jury Instructions

¶ 91    Following the close of evidence, the court held a jury instruction conference. Plaintiff proposed submitting an "issues instruction" that would state that Ploegstra and Lincoln Park Family Physicians were allegedly negligent in six respects. Specifically, the proposed instruction contained allegations that they:

"1. Failed to provide proper instruction to call 911 or go immediately to the emergency room to the plaintiffs during the first after-hours phone call on the morning of April 28, 2011;

2. Failed to provide proper instruction to call 911 or go immediately to the emergency room to the plaintiffs during the second after-hours phone call on the morning of April 28, 2011;

3. Provided alternative treatment advise [sic] to the plaintiffs during the first two after-hours phone calls on the morning of April 28 2011;

4. Failed to call 911 for the plaintiff if she believed plaintiffs were refusing to proceed to the emergency room during the early morning hours of April 28, 2011;

5. Failed to inform the plaintiffs of the potential risks of not proceeding to the emergency room during the first after-hours phone call on the morning of April 28, 2011; and

6. Failed to inform the plaintiffs of the potential risks of not proceeding to the emergency room during the first after-hours phone call on the morning of April 28, 2011."

¶ 92    Defense counsel objected to the issues instruction listing so many allegations, suggesting that they all amounted to claims that Ploegstra failed to give "proper advice and instruction, and that's included in [paragraphs] 1 and 2."

¶ 93    The court agreed with defense counsel, stating it would "strike paragraph 3, 4, 6, and 7 [sic]" from the proposed instruction" but would keep lines 1 and 2. The court also told plaintiff's

counsel "you can amend line 1 and 2 and add the word 'failed to provide proper instruction and advice to call 911.' "

¶ 94    Plaintiff's counsel then asked the court if lines 1 and 2 could be revised to say that Ploegstra "failed to provide proper instruction and advice by failing to instruct them to go to the emergency room, by providing alternative advice, by failing to inform of their potential life-threatening nature * * * rather than having them all a separate line item." The trial court denied that request. In doing so, it noted there was a "stark black and white difference in the testimony" as to whether Ploegstra actually told Patrick and Alasin to go to the emergency room.

¶ 95    The jury ultimately received an issues instruction with three claims of negligence, as follows:

> "The plaintiffs claim that they were injured and sustained damage,
> and that defendants Wendy Ploegstra, MSN, RN, FNP-BC, and
> Lincoln Park Family Physicians were negligent in one or more of
> the following respects:
>
> 1.  Failed to provide proper instruction and advice to the plaintiffs during the first after-hours phone call on the morning of April 28, 2011;
>
> 2.  Failed to provide proper instruction and advice to the plaintiffs during the second after-hours phone call on the morning of April 28, 2011;
>
> 3.  Failed to call 911 for the plaintiff if she believed plaintiffs were refusing to proceed to the emergency room during the early morning hours of April 28, 2011."

¶ 96    The transcript reflects that, when the court orally read the issues instruction to the jury, it did not read the word "proper" in line 1.[7]  Plaintiff's counsel did not object during the court's reading of this instruction.

¶ 97    The court separately instructed the jury regarding the plaintiff's burden of proof as follows:

> "The plaintiff has the burden of proving each of the following propositions as to the defendant:
>
> First, that the defendant acted or failed to act in one of the ways claimed by the plaintiff as stated to you in these instructions and that in so acting or failing to act, the defendants were negligent.
>
> Second, that the plaintiff was injured.
>
> Third, that the negligence of the defendants was a proximate cause of the injury to the plaintiff.
>
> If you find from your consideration of all the evidence that any of these propositions has not been proved, then your verdict shall be for the defendant. On the other hand, if you find from your consideration of all the evidence that all these propositions have been proved as to the defendant, then your verdict shall be for the plaintiff."

¶ 98    Jury Question and the Court's First and Supplemental Answers

¶ 99    During the jury's deliberations, the jury submitted to the court the following question: "Does the decision for each of the 3 counts need to be unanimous by the jurors?"

---

[7] During argument on the post-trial motion, the trial court did not concede that it omitted this word and suggested that the court reporter may have simply missed this word.

¶ 100    The court asked counsel for their position as to how the question should be answered, resulting in the following colloquy:

"THE COURT: Okay. So, Plaintiff, how do you suggest that we answer?

[Plaintiff's counsel]: That yes, they need to – well, how to – does the – I'm sorry. Can you re—yes.

No. The decision for each of the three counts does not need to be unanimous. If they agree on one, they can move forward.

THE COURT: Okay.

[Defense counsel]: the answer is about – a question about the law. And they say 'counts.' I presume they're referring – I think we all presume they're referring to the three issues. I believe that the appropriate answer to a question of this nature is for the jury to review the instructions as given and – for the answer. I think at this --

THE COURT: Okay.

[Defense counsel]: And that's my position.

THE COURT: Okay. Thank you.

I'm going to answer the question by stating one word. Yes.

[Plaintiff's counsel]: But it's not each of the three. So I think that's misleading. They don't have to say yes to all three. It's one or more and you move on."

Following this discussion, the court initially responded to the jury question with a written note stating: "Yes."

¶ 101    The briefs and the record reflect that the parties' counsel subsequently approached the court regarding a supplemental answer to the jury's question. However, there is no transcript of that discussion in the record. The court later sent a note to the jury stating:

"The answer to the question about unanimous agreement was incomplete and could be misinterpreted. The attached instructions, which you already have, more completely answer the question."

This supplemental answer attached the previously submitted issues instruction and the instruction regarding the plaintiff's burden of proof.

¶ 102    Later that evening, the jury returned a unanimous defense verdict.

¶ 103    Plaintiff's Post-Trial Motion

¶ 104    Plaintiff filed a post-trial motion in which she argued, *inter alia*, that (1) the court erroneously responded to the jury's question by stating its verdict "had to be unanimous on all allegations of negligence"; (2) the court "erroneously limited plaintiff's issue instructions to 3 generic sub-issues"; and (3) the court erroneously entered a directed verdict in favor of Dr. Tenhundfeld.

¶ 105    In conjunction with the post-trial motion, plaintiff's counsel submitted an affidavit in which one of her attorneys, Michael Peterson, attested that after the court's initial answer to the jury's

question, the parties' counsel "agreed that the Court' response was inaccurate" and brought the issue to the court's attention. According to the affidavit, the court agreed to submit a new answer but "would not agree to tell the jury that the prior answer was incorrect, only that it 'may be misinterpreted' and that the answer to the question could be found in the 'burden' instruction (21.02.01) and the 'issues' instruction (20.01) which were included with the answer and sent back to the jury." Peterson further attested that "the attorneys then drafted an answer" that was signed by the judge and brought to the jury room. According to Peterson's affidavit, "the Court required that the attorneys agree on the response to the jury's question."

¶ 106  Defendants filed a response to the post-trial motion on June 9, 2022. In conjunction with plaintiff's reply, plaintiff submitted an affidavit from one of her attorneys, Stephanie K. Nathanson, regarding discussions among counsel after the trial court's initial "Yes" answer to the jury question. Nathanson attested that one of the defense attorneys, Charles Redden, agreed with her that the court's initial answer was erroneous and "that we should re-address the response with the Court." Nathanson attested that she "remained in the hallway" while Peterson and Redden discussed the issue with the judge.[8]

¶ 107  On June 29, 2022, the court heard argument on the post-trial motion. During argument, plaintiff and defense counsel disagreed as to whether the attorneys for both parties had agreed on the content of the court's supplemental answer to the jury's question. The court denied the post-trial motion.

¶ 108   ANALYSIS

---

[8]     On June 15, 2022, plaintiff filed a separate "motion for recusal" alleging that the trial judge was biased against Nathanson, citing several portions of the trial transcript. That recusal motion was denied.

¶ 109 On appeal, plaintiff asserts distinct claims of errors with respect to (1) the entry of directed verdict in favor of Dr. Tenhundfeld; (2) the court's ruling on the content of the issues instruction; and (3) the court's response to the jury's question regarding unanimity. Separately, plaintiff urges that "[i]f a new trial is granted as to Dr. Tenhundfeld," a number of purportedly erroneous evidentiary rulings "should not be repeated." As discussed below, we find that reversal and remand for new trial as to all defendants is warranted due to (1) the erroneous entry of directed verdict for Dr. Tenhundfeld and (2) the court's erroneous response to the jury's ambiguous question while it deliberated the claims against the remaining defendants. We need not address the other claims of error.

¶ 110    The Court Improperly Granted a Directed Verdict to Dr. Tenhundfeld

¶ 111 We first discuss the propriety of the court's decision to grant Dr. Tenhundfeld a directed verdict at the close of plaintiff's case. "A motion for directed verdict will not be granted unless all of the evidence so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 225 (2010). "On review, all of the evidence must be construed in the light most favorable to the nonmoving party. [Citation.]" *Id.* Here, the evidence must be construed in the light most favorable to plaintiff.

¶ 112 "A directed verdict in favor of a defendant is appropriate when the plaintiff has not established a *prima facie* case. A plaintiff must present at least some evidence on every essential element of the cause of action or the defendant is entitled to judgment in his or her favor as a matter of law. [Citation.]" *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 123 (2004). "If the plaintiff fails to produce a required element of proof in support of her cause of action," then entry of a directed verdict for the defendant is proper. *Id.* On the other hand, a directed verdict "is granted improperly where there is any evidence, together with reasonable inferences to be drawn therefrom,

demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." (Internal quotation marks omitted.) *Jones v. DHR Cambridge Homes, Inc* , 381 Ill. App. 3d 18, 28 (2008). We review *de novo* a decision upon a motion for directed verdict. *Krywin*, 238 Ill. 2d at 225.

¶ 113   Here, the court granted the directed verdict upon finding that plaintiff did not establish a *prima facie* case against Dr. Tenhundfeld with respect to the element of proximate causation. For the following reasons, we find this was error.

¶ 114   "In a negligence medical malpractice case, the burden is on the plaintiff to prove the following elements of a cause of action: the proper standard of care against which the defendant physician's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury proximately caused by the physician's want of skill or care." *Sullivan*, 209 Ill. 2d at 112 (quoting *Purtill v. Hess*, 111 Ill. 2d 229, 241-42 (1986)).

¶ 115   "Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty. [Citation.]" *Susnis ex rel. Susnis v. Radfar*, 317 Ill. App. 3d 817, 826-27 (2000). If a plaintiff fails to prove proximate cause, "the plaintiff has not sustained the burden of making a *prima facie* case and a directed verdict is proper. [Citation.]" *Id.* "The mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate cause. The causal connection must not be contingent, speculative or merely possible." *Id.* at 827; (citing *Saxton v. Toole*, 240 Ill. App. 3d 204, 210-11 (1992)).

¶ 116   On appeal, plaintiff maintains that the evidence, including Dr. Papernik's expert testimony, satisfied each element to support her negligence claim against Dr. Tenhundfeld, including proximate cause. Plaintiff suggests two ways in which the expert testimony supported negligence liability.

¶ 117   Plaintiff's primary theory is that Dr. Tenhundfeld should have seen Patrick sooner after the last appointment on April 25, 2011. That is, his next appointment should have been 48 hours later (April 27) rather than 72 hours later (April 28). Plaintiff urges that, had Dr. Tenhundfeld seen Patrick on April 27, his bleed would have been discovered and treated in time to prevent his death.

¶ 118   Plaintiff emphasizes Dr. Papernik's testimony that, had Dr. Tenhundfeld examined Patrick on April 27, he could have realized that Patrick had signs and symptoms of bleeding. Plaintiff refers to the following exchange on redirect:

> "[Plaintiff's counsel:] Q. Okay. And when [defense counsel] says nothing would have changed on 4/27, have you explained to me all the reasons why 4/27 might have – if it was over 1.5 it would have caused a stepdown in the Coumadin? Anything else you believe it would have changed?
>
> A. It's just another point in time where you can examine the patient and make sure that no abnormalities are occurring.
>
> Q. Do you believe Pat was bleeding on 4/27?
>
> A. Yes.
>
> Q. And do you believe, if he saw Dr. Tenhundfeld on 4/27, Dr. Tenhundfeld would have realized he had signs and symptoms of bleeding, or should have realized?
>
> A. Correct.
>
> Q. And that's why you're saying it matters.
>
> A. Yes.

Q. So had the bleed been caught before 4/28 at *** 5:40-

something in the morning, it would have been a big difference in

this case, so it does matter, for causation and Pat's harm. Correct?

A. Correct."

¶ 119　We find that this expert testimony was sufficient to support this theory of proximate causation, such that the claim against Dr. Tenhundfeld should have reached the jury. We acknowledge that the foregoing exchange was the only point at which Dr. Papernik specifically indicated that a bleed would have been discoverable to Dr. Tenhundfeld on April 27. We also acknowledge that Dr. Papernik did not describe the particular signs or symptoms of internal bleeding that he believed Patrick would have exhibited, or precisely when on April 27, 2011 they would have been noticeable. On this point, defendants urge Dr. Papernik's testimony did not demonstrate that Patrick "would have been experiencing articulable signs and symptoms of an intra-abdominal bleed during a hypothetical encounter with Dr. Tenhundfeld" on April 27, 2011. While this may be a persuasive argument to a jury weighing the evidence, it does not mean the question should not have been submitted to the jury in the first place.

¶ 120　Certainly, a jury could find this lack of detail significant in weighing Dr. Papernik's causation testimony, especially since the other evidence was unclear as to when Patrick first experienced symptoms on April 27.[9] Nonetheless, plaintiff elicited clear expert testimony supporting the theory that Dr. Tenhundfeld's failure to see Patrick on April 27 proximately caused his injury. Keeping in mind that the evidence "must be construed in the light most favorable to the

---

[9] Alasin's testimony indicated that Patrick first reported feeling unwell sometime in the afternoon on April 27, although she was not asked to specify the time of day.

nonmoving party," *Krywin*, 238 Ill. 2d at 225, the cited testimony was sufficient to preclude a directed verdict. That is, plaintiff's primary theory of negligence against Dr. Tenhundfeld should have gone to the jury, which should have had an opportunity to accept or reject plaintiff's expert testimony along with the other trial evidence. See *Bosco v. Janowitz*, 358 Ill. App. 3d 450, 459 (2009) ("Where the parties offer conflicting medical testimony regarding the applicable standard of care and [the] defendant's breach of that standard, the jury is uniquely qualified to resolve the conflict." (Internal quotation marks omitted.)) In other words, directed verdict was improper because plaintiff elicited "evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." (Internal quotation marks omitted.) *Jones*, 381 Ill. App. 3d at 28.

¶ 121    Accordingly, we reverse the circuit court, insofar as it granted Dr. Tenhundfeld's motion for a directed verdict.[10] We thus remand for a new trial with respect to plaintiff's negligence claim against that defendant.

¶ 122    We note that plaintiff's briefing additionally urges that "[i]f this Court reverses and remands as to Dr. Tenhundfeld", we should address certain "prejudicially erroneous evidentiary rulings" to ensure they are not repeated at a new trial.[11] In so doing, plaintiff essentially asks us to issue an advisory opinion as to issues that may or may not come up on remand or in a hypothetical

---

[10] Because we find the directed verdict was improper on this basis, we need not consider plaintiff's alternative argument that Dr. Papernik's testimony otherwise provided evidence of proximate causation, under the theory that "Dr. Tenhunfeld's failure to properly counsel Pat and Alasin was shown by their actions."

[11] Specifically, plaintiff suggests that (1) the trial court erred in permitting Dr. Papernik to be cross-examined regarding the protocol of the American Academy of Family Practice for checking INR and that (2) Dr. Tenhundfeld should not have been able to testify that his treatment of Patrick was within the standard of care.

future appeal. "Courts of review will not decide moot or abstract questions * * * and will not render advisory opinions. [Citation.]" *People v. Bass*, 2021 IL 125434, ¶ 29. As the defendants' brief notes, on remand "the trial court will have an appropriate opportunity to exercise its discretion" based on the record before it. It is premature to address plaintiff's evidentiary arguments regarding proceedings on remand, and thus we decline to address them.

¶ 123                    The Trial Court Improperly Responded to the Jury's Ambiguous Question

¶ 124   We turn to address plaintiff's argument that the court committed prejudicial error when it answered "Yes" to the jury's question: "Does the decision for each of the three counts need to be unanimous by the jurors?" Notably, at oral argument both parties agreed that the meaning of this question – specifically the jury's reference to "the three counts" —was ambiguous.

¶ 125   Plaintiff avers that the "Yes" answer was incorrect because it told the jury that it had to be unanimous with respect to each of the three ways in which Ploegstra was alleged to be negligent. That is, plaintiff urges the "Yes" response mislead the jury by suggesting that it could not find in her favor unless it unanimously found she proved *all* three of the negligence allegations set forth in the issues instruction. At oral argument, plaintiff pointed out that this court has now held that where a medical defendant is alleged to have been negligent in multiple ways, the jury need not be unanimous as to the precise manner in a which the defendant committed medical negligence in order to return a plaintiff's verdict. See *Galich v. Advocate Health and Hospital Corp.,* 2024 IL App (1st) 230134.

¶ 126   Plaintiff recognizes that the court supplemented the initial answer with a note to the jury stating that its prior answer was "incomplete and could be misleading" and referring the jury to the written instructions. However, plaintiff urges this supplemental answer was insufficient to correct the harm from the original answer. Plaintiff points out that the supplemental answer did

not tell the jury that the previous answer was incorrect, or to disregard the initial answer. Plaintiff suggests that given the critical and potentially dispositive nature of the jury's inquiry about unanimity, the error caused substantial prejudice.

¶ 127    Defendants' response on this issue in its brief and at oral argument has been somewhat contradictory. Defendants' brief initially suggested that the court's initial "Yes" answer was legally correct because the jury's question the "three counts" likely referred to the three elements on which plaintiff bore the burden of proof, rather than the three numbered allegations in the issues instruction. Yet, defendants' brief elsewhere acknowledges that "the jury could have been asking about several different concepts" with respect to either the issues or burden instruction, implicitly admitting that the question was ambiguous. And at oral argument, defendants' counsel openly acknowledged that the jury question was ambiguous and that there is no way to know what the jury was referring to. Counsel also acknowleged that the trial court made no attempt to ascertain the jury's actual intent before answering "Yes."

¶ 128    Nevertheless, defendants urge that the supplemental answer precludes reversal. They argue that because plaintiff "assisted in the drafting of a curative response" and acquiesced to the court's supplemental answer to the jury question, it cannot now assert error with respect to the court's response. Defendants otherwise argue that plaintiff cannot show prejudice from any error. For the following reasons, we find the trial court committed reversible error when it answered "Yes" to the jury's question, without making any attempt to clarify what the jury was asking about. That error was not cured by the supplemental answer.

¶ 129    Generally, determining the propriety of a trial court's response to a jury question "requires a two-step analysis." *People v. Leach*, 2011 IL App (1st) 090339, ¶ 16. First, we determine "whether the trial court should have answered the jury's question" for an abuse of discretion. *Id*.

"Second, we must determine whether the trial court' response to the question was correct," which is a question of law. *Id.*

¶ 130   The parties do not dispute that the jury's question warranted a response from the trial court. This is consistent with this court's recognition that:

> "[T]he general rule is that the trial court has a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law * * *. [Citation.] This is true even though the jury was properly instructed originally. [Citation.] When a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy." *Van Winkle v. Owens-Corning Fiberglass Corp.*, 291 Ill. App. 3d 165, 172 (1997) (quoting *People v. Childs*, 159 Ill. 2d 217, 228-29 (1994)).

¶ 131   We thus turn to the propriety of the trial court's response. "[W]hen a trial court decides to answer a jury's question, it must do so correctly and 'must not misstate the law.' " *Leach*, 2011 IL App (1st) 090339, ¶ 15. "The failure to answer or the giving of a response which provides no answer to the particular question of law posed is prejudicial error." *People v. Allen*, 2022 IL App (1st) 190158, ¶ 22.

¶ 132   The propriety of the trial court's response to the question is a question of law that is reviewed *de novo*. *Leach*, 2011 IL App (1st) 090339, ¶ 16; see also *People v. Hudson*, 2023 IL App (1st) 192519, ¶ 60 ("We review *de novo* the legal accuracy of the trial court's answer to juror questions. [citation.]").

¶ 133   Given the Undisputed Ambiguity of the Jury Question, The Court's Initial "Yes" Answer Was Incomplete and Possibly Misleading

¶ 134 Given the ambiguity of the jury's question, we agree with plaintiff that the court's initial answer was improper, and may very well have confused the jury on a crucial issue. As the defendants openly admitted at oral argument, it was entirely unclear what the jury meant when it asked whether it had to be unanimous on the "three counts." The jury could have been asking about either the burden instruction (which specified three elements plaintiff needed to prove) or the issues instruction (which set forth three ways in which defendants were allegedly negligent).

¶ 135 Significantly, the trial court made no attempt to clarify the meaning of the jury's question. This itself was error. See *Childs*, 159 Ill. 2d at 229 ("If the question asked by the jury is unclear, it is the court's duty to seek clarification of it."). This is remarkable since (as defendants concede) there were at least two distinct possibilities of what the jury meant when it asked about "three counts."

¶ 136 This initial error was compounded by the court's "Yes" response. That answer potentially misstated the law and quite easily could have misled the jury on a crucial question that may have impacted its decision to render a defense verdict.

¶ 137 Defendants urge that the "Yes" answer would be legally correct, if the jury was asking whether it had to unanimously find (1) negligence, (2) proximate causation and (3) damages to render a plaintiff's verdict. Defendants suggest that it is likely that the jury's question referenced plaintiff's burden of proof as to these elements.

¶ 138 Of course, we cannot assume that the jury's use of the word "counts" referenced the elements of negligence. We think it is just as (if not more) likely that when the jury asked whether it needed to be unanimous on "each of the three counts," it was asking whether it needed to find that plaintiff proved all three allegations from the issues instruction, *i.e.*, that (1) Ploegstra failed to give proper advice and instruction in the first after-hours call; (2) she failed to give proper advice

and instruction in the second call; and (3) that she failed to call 911 "if she believed plaintiffs were refusing to proceed to the emergency room." Indeed, it would not be surprising for a jury composed of laypersons to use the term "counts" when they meant to refer to "allegations."

¶ 139    If the jury meant to ask whether they needed to be unanimous that plaintiff proved each of the three allegations to render a plaintiff's verdict, then the "Yes" answer was plainly legally incorrect. Defendants do not dispute that, for the plaintiff to be entitled to a verdict, the jury only needed to find that Ploegstra was negligent in one (or more) of the three ways enumerated in the issues instruction. See *Galich*, 2024 IL App (1st) 230134, ¶¶ 55-56 (where doctor was alleged to be negligent in four ways, "[t]he specific allegations of Dr. Joo's acts or omissions are not separate elements of the claim on which the jury must unanimously agree, provided they agree his failure to meet the standard of care caused [plaintiff's] injuries. The jury's verdict indicated they unanimously agreed Dr. Joo's negligence caused [plaintiff's] injury. That is all the law requires.").[12]    The court's initial answer was erroneous and prejudicial, to the extent it suggested that the jury needed to unanimously find that plaintiff had proven not just one, but all three "counts" of alleged negligence.

¶ 140    Defendants contend that, even assuming the initial "Yes" answer was error, it is not reversible because plaintiff cannot show that prejudice resulted from that response. We disagree. The record shows a clear and unacceptable risk that the jury was improperly instructed about a key question that could very well have impacted the verdict. As already stated, the court is obligated to (1) seek clarification of an unclear question and (2) it must not misstate the law when it answers

---

[12] We note that *Galich* also rejected the defense argument that if a medical provider is alleged to be negligent in multiple ways, the jury must be unanimous as to the specific way in which defendant was negligent, rather than reaching a verdict by " 'mix[ing] and match[ing]' negligence allegations to reach a patchwork consensus". 2024 IL App (1st) 230134, ¶¶ 43-45.

the question. Largely due to the court's failure to seek clarification of what the jury meant when it referred to the "three counts", the court's subsequent "Yes" answer could very well have misled the jury into believing that it could not find for plaintiff unless they unanimously found that all three enumerated allegations were proven. The jury could have been led to believe the plaintiff needed to convince them that defendants were negligent *in all three* enumerated ways, in order to render a verdict for her. Certainly, the jury's misapprehension on this point could have led them to render a defense verdict (if, for example, they concluded plaintiff had proven one or two of the enumerated allegations but erroneously believed they needed to be unanimous as to all three "counts" of negligence). Under these circumstances, the error was prejudicial.

¶ 141    Plaintiff's Agreement to the Supplemental Answer Did Not Preclude Her Claim of Error
Regarding the Initial Answer

¶ 142    Our analysis cannot end there, however, since the court supplemented its initial "Yes" answer to the jury's question after meeting with the parties' counsel. Specifically, the court told the jury: "The answer to the question about unanimous agreement was incomplete and could be misleading. The attached instruction, which you already have, more completely answer the question." As part of the supplemental response, the jury again received the written issues and burden instruction.

¶ 143    Defendants argue that plaintiff's "silence and/or acts of acquiescence" to the supplemental answer bars her from challenging the *initial* "Yes" answer. We disagree.

¶ 144    We recognize that: "Generally, when a party consents to a trial court's answer to a jury question, that party cannot later argue that the trial court's answer was an abuse of discretion." *Cipolla v. Village of Oak Lawn*, 2015 IL App (1st) 132228, ¶ 29 (citing *People v. Averett*, 237 Ill. 2d 1, 24 (2010) ("When a defendant acquiesces in the trial court's answer to a question from the

jury, the defendant cannot later complain that the trial court's answer was an abuse of discretion. [Citation.]").

¶ 145   The record does not show that plaintiff contemporaneously objected to the supplemental answer.[13] Plaintiff's post-trial briefing reflects that the parties jointly drafted the supplemental answer. However, even assuming plaintiff acquiesced to the contents of the supplemental answer, we do not find it acts as a waiver to her claim of error that she was *already* prejudiced by the court's *initial* answer to the jury's question, and that supplemental answer was insufficient to cure it. That is, we do not equate her apparent agreement with the supplemental response as a waiver of her right to challenge the previous erroneous response. It would be unjust to do so. Quite understandably, her counsel (with defense counsel's participation) urged the trial court to address the erroneous initial response through a supplemental response, all while the jury continued its deliberations. We will not penalize her on appeal by deeming her counsel's attempt to cure the initial answer with a supplemental answer as a waiver of her right to raise the error in this court.

¶ 146   The Supplemental Answer Did Not Cure the Prejudice from the Initial Answer

¶ 147   Regardless of whether plaintiff acquiesced to the supplemental answer, we agree with plaintiff that it was insufficient to cure the prejudice resulting from the court's initial erroneous "Yes" answer. Indeed, the supplemental answer very well could have exacerbated the confusion from the initial answer.

¶ 148   As plaintiff notes, the supplemental answer did not advise the jury that the court's initial "Yes" answer was incorrect. Nor did it tell the jury to simply disregard the prior answer, which

---

[13] There is no transcript of the discussion between the parties' counsel and the court as to the content of the supplemental answer. Nor does the common law record suggest that plaintiff proposed any written alternative supplemental answer for the court's consideration.

could have more succinctly put the issue to rest. Instead, the supplemental answer stated that the court's initial answer "was incomplete and could be misleading" before directing the jury to the previously-submitted written instructions. We disagree with defendants' suggestion that the supplemental response corrected any pre-existing error. Indeed, the supplemental answer could have raised additional questions in the jury's mind as to how the prior "Yes" answer was "incomplete" or "misleading." Moreover, the supplemental answer gave no substantive guidance to the jury but simply referred them back to the original written instructions, which the jury already had *before* they asked the question about unanimity. In this regard, the supplemental answer did not actually address the confusion indicated by the question in the first place.

¶ 149    In summary, we agree with plaintiff that the initial answer to the jury's ambiguous question was prejudicial error, which was not cured by the supplemental answer. Accordingly, we reverse the verdicts in favor of Lincoln Park Family Physicians and Ploegstra and remand for new trial.

¶ 150    As we reverse the verdicts in favor of those defendants and remand for a new trial on this basis, we need not additionally discuss plaintiff's claim that the trial court erred in limiting the content of the issues instruction.

¶ 151    Finally, we conclude that the new trial should proceed before a different trial judge to guard against potential claims of bias on remand. We acknowledge that plaintiff did not ask for that specific relief in this appeal. However, the record makes clear that the relationship between the trial judge and plaintiff's lead trial attorney, Stephanie Nathanson, deteriorated significantly over the course of the trial through several negative interactions. During one sidebar, Nathanson complained that the judge had made "personal insults" and "attacks" on her throughout the trial, including remarks off the record. The trial judge denied Nathanson's characterization, but elsewhere told Nathanson that she was "behav[ing] unprofessionally" and "hurting your client's

case." Such interactions prompted plaintiff to file a post-trial motion requesting that the judge recuse herself from further proceedings in this case, which request was denied. Moreover, the record reflects that days after the jury verdict in this case, the trial judge recused herself in another case where Nathanson was attorney of record, *Castle v. Vitello et al.,* No. 17 L 3136, shortly after Nathanson notified the court that she would seek substitution of judge in that matter.

¶ 152   To be clear, we do not suggest that the trial court's interactions with Nathanson reflected any actual bias by the trial judge that affected its rulings in the case. However, to avoid even the appearance of potential bias in future proceedings, we believe the best course of action is for a different trial judge to preside over proceedings on remand.

¶ 153   CONCLUSION

¶ 154   In summary, we first find that the directed verdict was improperly granted in favor of Dr. Tenhundfeld. Thus, plaintiff is entitled to reversal and retrial of her negligence claims against that defendant.

¶ 155   Retrial is also warranted with respect to plaintiff's claims against Lincoln Park Family Physicians and Ploegstra, due to the court's error in responding to the jury's ambiguous question while it deliberated the claims against those two defendants. Accordingly, we reverse and remand for a new trial with respect to all three defendants. A different trial judge should preside over proceedings on remand.

¶ 156   Reversed and remanded with directions.